Filed 6/30/15  P. v. Miller CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>WALTER KRISTOPHER MILLER,<br><br>    Defendant and Appellant. | A140999<br><br>(Mendocino County<br>Super. Ct. No.<br>SCUKCRCR137143703) |

Defendant Walter Kristopher Miller was charged with premeditated attempted murder of Deputy Sheriff Darren Brewster (Pen. Code, §§ 187, subd. (a), 664)[1]; assault with a firearm on Brewster (§ 245, subd. (d)(1)); two counts of first degree burglary (§§ 459, 460, subd. (a)); dissuading a witness (§ 136.1, subdivision (c)(1)); and possession of a firearm by a felon (§ 29800, subd. (a)).  He entered a no contest plea to one of the burglary counts, and was convicted by a jury of the other offenses.  The court found that Miller had two prior strike convictions (§§ 667, 1170.12), two prior serious felony convictions (§ 667, subd. (a)), and had served two prior prison terms within the past five years (§ 667.5, subd. (b)).  The court sentenced him to an indeterminate term of 115 years to life in prison, and a consecutive determinate term of 68 years.

Miller contends that the court erred when it denied his motion to remove a juror who briefly dozed off twice during his 10-day trial.  He also identifies a sentencing error,

---

[1] Subsequent statutory references are to the Penal Code.

which the People concede. The juror's retention was not an abuse of discretion, and we affirm the judgment as modified to correct the sentencing error.

## I.  BACKGROUND

A.  Assault on Deputy Brewster

Miller admitted that he and Christopher Skaggs burglarized the residence of William Haga and his wife on February 25, 2013, and stole ammunition and several weapons, including a 9 millimeter AP-9 handgun. After responding to the Haga burglary that night, Brewster was on his way to another assignment when he noticed a car merge dangerously into traffic and tailgate another vehicle. He pulled the car over after confirming that its registration had expired. When he got to the driver's window and asked for the driver's license and registration, the driver "smirked" and sped off. Brewster pursued.

Brewster testified that during the chase, Miller, a passenger in the car, leaned out a window, turned completely around to face him and fired shots at him from a handgun. Based on the "multiple muzzle flashes" Brewster saw from the gun, he believed that the gun was pointed at him when it was fired. He veered to avoid the shots and tried to continue the chase, but his car slowed and he pulled to a stop. He discovered a bullet hole in his radiator, and fluid all over the road.

Miller was arrested two days later in a motel after a three-hour standoff. Police found an AP-9 handgun and two ammunition clips in the room. Police found one bullet and three shell casings near where Brewster's car was shot. Toolmark analysis indicated the casings were fired from the AP-9 handgun found in the motel room where Miller was arrested.

Skaggs's girlfriend Tracy Cox testified that Skaggs was driving the car, Miller was in the front passenger seat, and she was in the back seat when Miller fired the shots. She said that when Brewster approached the car, she told Skaggs to drive off because she was afraid that Miller was going to kill Brewster. She said Miller had a gun, put his hand on Skagg's head, and told him to duck just as Brewster was getting to the driver's door. She

2

said that, during the chase, Miller leaned out the window and fired four shots, with his body facing Brewster's car.

Miller gave a statement to the police five days after his arrest. Miller denied involvement in the Haga burglary, and said Skaggs did not want to be stopped because there was stolen property in the car. He said Skaggs handed him the pistol when he first got into the car, and that Cox encouraged him to shoot it at Brewster. He resisted and told her he would not "shoot a cop." He leaned out the window and fired the gun, but did not aim at Brewster's car. He fired the gun in the air hoping Brewster would "back off," and did not intend to hurt anyone.

Miller testified at trial that he put his arm out of the window with the gun perpendicular to the car and not aimed at Brewster, and fired several rounds to deter the pursuit.

B. The Bennett Burglary and Dissuading a Witness

Mark Bennett testified that he was asleep with his girlfriend on the morning of February 21, 2013, when he heard someone call his name. He found Miller, whom he had not seen in 20 years, in his living room. Miller was standing awkwardly, and went outside the house as Bennett approached him. Miller asked Bennett if he could help him get marijuana, and Bennett replied that he no longer used it. They exchanged phone numbers and Miller left. When Bennett's girlfriend woke up, they found that her computer was gone, and items from her purse were missing.

Bennett called Miller, demanding that he return the missing items. Miller denied taking anything so Bennett called the police, who tried to contact Miller. Miller called Bennett, denying that he had stolen anything, and angry that he was getting calls from the police, and Bennett said, "I have people in the D.A.'s office." Miller responded, "Well, I have friends in the street that will end you." Bennett took this as a death threat because Miller was "one of the most dangerous human beings" he had "ever spent time with."

## II. DISCUSSION

### A. Retention of the Sleeping Juror

#### (1) Record

During cross-examination of investigating detective Andrew Whiteaker, the prosecutor asked to approach the bench. After a discussion at the bench, the court called a recess and noted that a juror "appear[ed] to have dozed off, and it's the same person who looked close to having dozed off on a previous day." The court said it would discuss the situation with the juror at the end of the day. After the other jurors were excused for the day, the court told the juror that he appeared to doze off while Whiteaker was testifying, and asked the juror "whether you believe that you have been able to fully pay attention to and grasp the evidence as it comes in." The juror answered, "Yes, I have."

After the juror left the courtroom, the court said that the juror "had, in fact, nodded off" during Whiteaker's testimony, "and was roused by the juror next to him." A defense investigator stated that he had observed the juror sleeping "for five minutes at least," "if not longer," the previous day. The prosecutor said that when the juror "shuts down, he seems to shut down quickly," and the court replied, "[t]horoughly." The prosecutor stated that when the prior day's sleeping was brought to the court's attention, the court "took action and got him up and going." The court said that the previous day it "did essentially take what action you can, which is to make a slightly louder noise and get everybody to stand up and stretch, who was willing to do it. And that seemed to bring him back."

Defense counsel moved to have the juror discharged; the prosecutor did not join in the motion. The court said it was "on the fence on this," and that it would rule on the motion after the parties rested their cases.

After the prosecutor's closing argument, the court noted that "we did have a discussion about [the sleeping juror] earlier in the proceeding. And I said I would keep an eye on him through the rest of the proceeding to see whether I thought any action was warranted. [¶] He told all of us that he felt that he had apprehended all that came in, and I

4

saw no reason to question his level of attentiveness after our last discussion.  [¶] I don't intend to take any action with respect to that juror."

(2)  Analysis

"Under section 1089, the court, upon 'good cause shown,' may discharge any juror 'found to be unable to perform his duty' at any time during the trial.  [Citation.] The determination of 'good cause' rests in the sound discretion of the court [citations], and the court's finding thereof will be upheld if substantial evidence supports it [citation]." (*People v. Johnson* (1993) 6 Cal.4th 1, 21, disapproved on another ground in *People v. Rogers* (2006) 39 Cal.4th 826, 879.)  Sleeping during trial can constitute good cause for a juror's removal (*People v. Bonilla* (2007) 41 Cal.4th 313, 350), and "juror inattentiveness may constitute misconduct" that raises a rebuttable presumption of prejudice.  (*Hasson v. Ford Motor Co.* (1982) 32 Cal.3d 388, 411, 416–417.)  "Some of the factors to be considered when determining whether the presumption is rebutted are the strength of the evidence that misconduct occurred, the nature and seriousness of the misconduct, and the probability that actual prejudice may have ensued." (*Id.* at p. 417.)

"Although implicitly recognizing that juror inattentiveness may constitute misconduct, courts have exhibited an understandable reluctance to overturn jury verdicts on the ground of inattentiveness during trial. . . . Perhaps recognizing the soporific effect of many trials when viewed from a layman's perspective, these cases uniformly decline to order a new trial in the absence of convincing proof that the jurors were actually asleep during *material portions* of the trial." (*Hasson v. Ford Motor Co.*, *supra*, 32 Cal.3d at p. 411 [italics added].)

" 'Once a trial court is put on notice that good cause to discharge a juror may exist, it is the court's duty "to make whatever inquiry is reasonably necessary" to determine whether the juror should be discharged.' " (*People v. Bradford* (1997) 15 Cal.4th 1229, 1348 (*Bradford*).)  No such inquiry was mandated in *Bradford*, where the trial court commented, while ruling on an objection, " 'We have a juror that's asleep.'  Defense counsel responded:  'That's why I'm trying to make this go fast.  The juror was asleep all day yesterday, also.'  The court responded:  'I know.' " (*Ibid.*)  The *Bradford* court

5

wrote: "[T]he record reveal[ed] no more than that the juror had fallen asleep on the day in question and appears to have been asleep one day earlier; it does not appear that the juror continued to fall asleep or had been asleep for a longer period of time." (*Id.* at pp. 1348–1349.) "[T]he absence of any reference in the record to the juror's inattentiveness over a more substantial period indicates that the trial court did not abuse its discretion in failing to conduct an inquiry" of the juror. (*Id.* at p. 1349.)

If a failure to inquire into a juror's inattentiveness was not an abuse of discretion in *Bradford*, neither was the court's failure to remove a juror after such an inquiry in this case.

Miller's attempts to distinguish *Bradford* are unpersuasive. He argues that "[u]nlike in *Bradford*, there was ample evidence here that the juror had missed a substantial portion of the trial." But the record here established that the juror was asleep for only a few minutes on two occasions, whereas the opinion in *Bradford* suggested that the juror there may have been asleep for substantial portions of an entire day. Miller also points out that his counsel moved to discharge the juror in this case, while the *Bradford* court observed that defense counsel in that case did not allege juror misconduct or request a hearing on the subject. (*Bradford*, *supra*, 15 Cal.4th at p. 1349.) But counsel here did not make the motion when the juror first fell asleep on the day before he was questioned by the court, and it does not appear the juror missed any testimony that might arguably have been material to the case.

During the court's discussion with counsel when the juror nodded off the second time, the prosecutor noted that Whiteaker's testimony was merely "going back over" photos of the motel room where Miller was arrested. The prosecutor thought the juror had not "lost anything really today," and Miller does not dispute the point. However, he argues that he might have been prejudiced if the juror missed portions of Tracy Cox's testimony the prior day. Cox's testimony tended to show that he had a premeditated intent to kill Deputy Brewster, but her credibility was impeached when she admitted, among other things, that she lied to the police when she was interviewed after her arrest.

6

We can be reasonably certain that the juror fell asleep toward the end of Cox's cross-examination following the lunch recess, shortly before or after the court remarked that the cross-examination had "been lengthy." During the discussion with counsel, the court said it had the jurors get up and stretch after learning from Miller's attorney that the juror was sleeping. This occurred on page 688 of the reporter's transcript, which reads: "[Defense Counsel]: Could we approach briefly, your honor? The Court: Okay. (Discussion at the Bench) The Court: I'm going to just ask that everybody stretch for a second. We can all standup for just a second and stretch." (Paragraph breaks omitted.) Defense counsel then asked Cox whether she wanted to change any of her testimony, Cox answered, "no," and her cross-examination concluded.

But all of Cox's potentially significant impeachment occurred during her 70 pages of morning testimony. Before the lunch break, she admitted being a convicted felon and initially lying to the police. She said she gave a second statement to the police, eight months after the incident, that was truthful. She said she was originally told that she would be charged with attempted murder and conspiracy, but had recently been informed that she would be charged as an "accessory after the fact." She said that, when she gave the second statement, it did not occur to her that she might receive a lesser sentence if she provided evidence favorable to the prosecution.

In her afternoon testimony, she explained how she and Skaggs made their way to Ukiah after leaving the car, and described the circumstances of their arrest the day after the chase. She repeatedly said she could not remember statements she made in her second police interview, but recalled saying that Miller's whole body was pointed in the direction he fired the shots. She admitted using methamphetamine the day before the incident, but said she felt no effects from the drug during the chase the following night. Even if the juror slept through all of the afternoon testimony—which is unlikely given the time he was observed sleeping—there is no reasonable prospect that he would have formed a significantly different impression of Cox's veracity had he stayed awake. If Miller's counsel thought otherwise, then presumably he would have moved to discharge

7

the juror after Cox's testimony, and not waited until the juror fell asleep again the next day to request that he be removed.

Accordingly, there was no error or prejudice in connection with the juror's retention. Miller contends that a sleeping juror during trial constitutes a structural error that mandates reversal without a showing of prejudice, but concedes that we are bound to follow our Supreme Court's decision to the contrary in *Hasson v. Ford Motor Co.*, *supra*, 32 Cal.3d at pp. 411, 417.

B. <u>Sentencing Issue</u>

Miller argues, the People concede, and we agree that the indeterminate and determinate sentences on count 2—assault with a firearm on Brewster—must each be reduced by one year.

The court imposed an indeterminate sentence of 40 years to life on count 2 as follows: the upper term of eight years for the assault; 20 years for the firearm use; ten years for two prior serious felony enhancements (§ 667, subd. (a)); and two years for two prison term enhancements (§ 667.5, subd. (b)). One of the prior serious felony enhancements and one of the prior prison term enhancements were based on the same prior conviction for dissuading a witness. The court cannot impose both a five-year enhancement under section 667 and a one-year enhancement under section 667.5 if the enhancements are based on the same conviction; only the five-year enhancement is available. (*People v. Jones* (1993) 5 Cal.4th 1142, 1149–1150.) Therefore, one section 667.5 one-year enhancement must be stricken, and the indeterminate term on count 2 must be reduced to 39 years to life.

The court imposed a determinate term of 32 years on count 2, consisting of 20 years for the firearm use, ten years for the prior felony convictions, and two years for the prior prison terms. For the reason explained in the preceding paragraph, one of the prior prison term enhancements must be stricken, and the determinate term for count 2 must be reduced to 31 years.

8

## III.  DISPOSITION

The judgment is modified to strike one section 667.5, subdivision (b) enhancement from the indeterminate term and the determinate term sentences on count 2.  As so modified, the judgment is affirmed.  The trial court is directed to prepare and forward to the Department of Corrections and Rehabilitation an amended abstract of judgment reflecting the modifications.

_____
Siggins, J.

We concur:

_____
Pollak, Acting P.J.

_____
Jenkins, J.