Filed 11/19/20  Mata v. Liberty Utilities (Park Water) Corp. CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| ALFRED MATA et al., | B293479 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. |
| v. | Nos. BC655564) |
| LIBERTY UTILITIES (PARK WATER) CORP, | |
| Defendant and Appellant. | |

APPEALS from a judgment of the Superior Court of Los Angeles County, Michele E. Flurer, Judge.  Affirmed.

Weitz & Luxenberg, Benno Ashrafi and Josiah Parker for Plaintiffs and Appellants.

Greines, Martin, Stein & Richland, Robert A. Olson, Geoffrey B. Kehlmann; Lewis Brisbois Bisgaard & Smith and Jeffry A. Miller for Defendant and Appellant.

Fred J. Hiestand for The Civil Justice Association of California as Amicus Curiae on behalf of Defendant and Appellant.

In this negligence and loss-of-consortium action brought by Alfred Mata and Leticia Mata[1] (collectively plaintiffs) against several defendants, a jury found that Alfred developed mesothelioma from secondary or take-home exposure to asbestos on the uniform that his father, Francisco Mata, wore as an employee of Liberty Utilities (Park Water) Corp. (hereafter Park Water). The jury found that Park Water was liable for a slight majority of plaintiffs' $6.3 million in damages and imposed $5 million in punitive damages on that defendant. The trial court granted Park Water's motion for judgment notwithstanding the verdict (JNOV) and vacated the punitive damages award. Plaintiffs appeal from the ensuing modified judgment and Park Water filed a protective appeal. We hold that plaintiffs failed to adduce evidence from which the jury could find by clear and convincing evidence that Park Water's management acted with malice as required by Civil Code section 3294.[2] Accordingly, we affirm the judgment.

## BACKGROUND

I.    The parties

Park Water was founded in 1936 and incorporated in 1937. Headquartered in Downey, California, the company is a for-profit utility, regulated by the Public Utilities Commission (PUC). Park Water provides water to customers in cities in southern Los Angeles County. In the 1970's, it had about 90 to 100 employees.

___

[1] We refer to members of the Mata family by their first names for the sake of clarity; we intend no disrespect.

[2] All further statutory references are to the Civil Code unless otherwise indicated.

Francisco was employed at Park Water from 1970 until 1989.  During his tenure, he worked in the construction, service, and gardening departments, where his duties involved installing and repairing meters, hydrants, and pipes, and reading meters.  His job included cutting or milling the water pipes.  When he cut pipes, Francisco used a power saw that created a lot of visible dust, which he inhaled, and which got on his clothing.

Francisco's son, Alfred, who was age 66 at the time of trial, was diagnosed with mesothelioma in early 2017.  He lived with Francisco during Francisco's entire tenure at Park Water.

II.     Water main installation and repair at Park Water

In the 1970's and 1980's, Park Water used both asbestos cement (A/C) pipes and nonasbestos pipes that were made of cast iron, ductile iron, steel, and polyvinyl chloride.  The A/C pipe contained both chrysotile and the most toxic form, crocidolite, asbestos.  Mesothelioma can result from very little exposure to crocidolite asbestos fibers.

Water mains were installed and repaired by Park Water's construction and service departments where Francisco worked.  There were two ways to repair A/C pipe:  sawing it and putting a clamp on it.  Park Water provided power saws and so-called snap cutters to cut A/C pipe.  Cutting pipes was not a daily occurrence on job sites.  There were approximately two to three leaks a year on Park Water's A/C pipe.  The crew cut pipes about every other day, although there would be days that the crew might cut them three or four times.  It took roughly one minute to cut the pipe and the crew member cutting it would do so outside, alone, and away from the pipe's trench and other crew members.  Repairing existing pipe was not a dusty process because the water pipes were already wet and muddy.

Dennis Brooks started at Park Water in 1972. He worked in the construction and service departments and knew Francisco in the 1980's. According to Brooks, Francisco did not like to cut pipe. Brooks never saw Francisco cut A/C pipe the entire time Francisco worked at Park Water. Plaintiffs' and Park Water's industrial hygiene experts agreed that during his work at Park Water, "unless he had an odd day," Francisco's exposure to asbestos would not have exceeded state or federal Occupational Safety and Health Administration (OSHA) limits.

Park Water provided laundry service, showers, and locker rooms during Francisco's tenure. The company neither discouraged nor required use of these facilities, although it charged employees to wash their uniforms until 1974.

In the 1970's, Park Water began using outside contractors to fix pipes, and by 1985 or 1990 the contractors were the only workers handling pipes. The company stopped installing A/C pipe by 1985. At a meeting in 1986 or 1987 (the meeting), Park Water's management, Tom Snodgrass, Ted May, and the company's owner in the 1970's and 1980's, Sam Wheeler, told employees to stop installing or touching previously installed A/C pipe.

III. Asbestos regulations

In 1936, the year Park Water was created, the California Industrial Accident Commission issued safety orders establishing the maximum permissible toxic threshold for asbestos fibers. Known as order 1910, it required in subdivision (c) that employers provide "a change room, shower baths and lavatories, having hot and cold running water, in every place of employment where the lack of such facilities would constitute a health hazard."

4

In 1972, two years after Francisco began working at Park Water, the federal OSHA promulgated regulations addressing the standards for all workplaces exposed to any kind of asbestos. (37 Fed.Reg. 11318 (June 7, 1972).)  Effective July 1, 1976, the regulations established the permissible limits for exposure to airborne concentrations of asbestos (29 C.F.R. § 1910.93a(b) (1972)) and provided for regular monitoring and medical examinations of all employees exposed to such limits (29 C.F.R. § 1910.93a(f) & (j) (1972)).  Employers were required to maintain their monitoring and medical examination records.  (29 C.F.R. § 1910.93a(h) (1972).)  The regulations also established methods of compliance and work practices.  Among other things, employers were legally mandated to provide employees with personal protective equipment, showers, changing rooms, lockers, and laundry facilities.  (29 C.F.R. § 1910.93a(d) (1972).)  The regulations required that all asbestos be wet when handled, the so-called wet-down method for working with the substance. (29 C.F.R. § 1910.93a(c) (1972).)  Additionally, the regulations directed employers to affix caution labels to products containing asbestos, to post caution signs where concentrations of airborne asbestos fibers exceeded the established exposure limits, and to inform employees of the fact they were working with asbestos. (29 C.F.R. § 1910.93a(g) (1972).)

In 1977, the State Department of Public Health notified employers who used asbestos that the Occupational Safety and Health Standards Board had adopted regulations requiring employers using cancer-causing substances, such as asbestos, to submit written reports about their asbestos use and about any release of potentially hazardous amounts of such substances where employees could be exposed.

5

IV.   Manufacturers' information

Park Water purchased A/C pipes from Johns Mansville and CertainTeed.  A representative at CertainTeed confirmed that the company started issuing booklets about safe work practices for A/C water pipes in 1977, and first attached asbestos warnings to the pipes themselves in 1979.  However, there is no such booklet in the Park Water files and no evidence that CertainTeed sent the booklet to Park Water.  Brooks did not remember seeing cancer warning labels on A/C pipes.

Johns Manville's technical data sheet, exhibit 50, was found in an historic Park Water job file.  The technical data sheet did not warn of the risks from cutting A/C pipe.  Instead, section 2.1, entitled "Installation" (capitalization omitted) provided that all "pipe, couplings, fittings and rubber rings shall be installed in accordance with contract plans and specifications and the '[American Water Works Association] Standard for Installation of Asbestos Cement Water Pipe.' "  In turn, the American Water Works Association (AWWA) standard, dated 1977, described the use of power-driven saws with abrasive discs to dry cut or bevel A/C pipe as being a "non-recommended work practice."  The AWWA standard explained that abrasive disc cutters produced concentrations of airborne dust that exceeded OSHA's permissible levels.  Park Water did not have the AWWA standard, exhibit 53, in its files.  Park Water was a member of the AWWA at some point but there is no indication that anyone at Park Water was a member of AWWA or read the AWWA standard at any time that Francisco worked there.

V.    Park Water's asbestos-safety history

Gregory S. Sorensen became president of Park Water in 2016 when the company was purchased by Liberty Utilities.  He testified, and Dennis Brooks agreed, that historically Park Water and its owner Wheeler were safety conscious and would try to stay as up to date as possible on state and federal safety regulations applicable to the company's workforce.

As Park Water's person most qualified to testify about the company, Sorensen testified he did not see documents or hear from employees indicating that Park Water warned its workers in the 1970's and 1980's about the cancer risk of exposure to asbestos.  He saw no study done by the company to determine whether there was an increased risk to employees of asbestos-related disease.  Park Water had no documents confirming that it discussed with employees the best and safest work practices with A/C pipe, although it was not the sort of documentation the company would typically retain.  The file contained no directive from Park Water to its employees in the 1970's or 1980's mandating that those who worked with A/C pipe shower at the company's facility before leaving work.  Sorensen saw no documentation that Park Water offered its laundry service specifically for safety reasons.

As a highly regulated public utility, Sorensen explained, Park Water had no financial incentive to economize on safety because the PUC sets Park Water's rates and safety costs are passed onto the ratepayers.

Park Water held safety meetings every two weeks. California OSHA conducted inspections of Park Water.  There was no record in the files indicating, and Francisco never heard, that the company was ever cited for a California OSHA safety

7

violation, or ever received a worker's compensation or other claim from any former employee for illness as the result of exposure to asbestos during the relevant period.

Brooks could not recall seeing written instructions about safety measures when handling A/C pipe, or being told to stop using the power saws before 1985. Brooks did not recall seeing instructions about how to cut the mains properly, or directives to wear masks. Before 1980, Brooks never saw anyone at Park Water use the wet-down method to abate the problem of excessive dust during the cutting process. There was no hood or exhaust device to collect dust coming off saws cutting asbestos in the field, or any physical separation between those handling A/C pipe and other employees. Between 1972 and 1985, Brooks remembered seeing workers with handkerchiefs, but not masks, covering their noses and mouths when sawing pipes. He did not know whether that was by choice or on orders from management. Brooks testified that the first time he recalled Park Water's management informing employees to use precautionary measures when installing, repairing, handling, or cutting A/C pipe was at the meeting in 1985 or 1986. Park Water told employees at the meeting that they had to wear special equipment when handling A/C pipe such as respirators and masks, and to use the wet-down method to avoid making dust. That is when Brooks decided not to touch A/C pipe and when the company told employees simply not to handle A/C pipe at all.

VI.     The procedural background

Plaintiffs' complaint sought damages on theories of negligence, strict liability, premises liability, loss of consortium, and sought punitive damages against several defendants, including Park Water. At the close of trial against Park Water

only, the jury returned a verdict finding that Alfred was exposed to asbestos that Francisco took home from work, and that Park Water's negligence was a substantial factor in causing Alfred's mesothelioma. The jury awarded plaintiffs $6,376,500 in economic and noneconomic damages, for which amount it found Park Water 54 percent responsible. It also found that an officer, director, or managing agent of Park Water acted with malice. After the punitive damages phase of the trial, the jury imposed $5 million in punitive damages against Park Water.

Park Water moved for JNOV and for new trial. The JNOV motion was based on an asserted absence of evidence of the willful, conscious disregard for safety that is required for malice, or that any officer or managing agent knew of the danger and consciously disregarded it, or later ratified an employee's malicious conduct. Park Water also argued that the amount of punitive damages was excessive in light of the evidence of the company's financial condition, and that Public Utilities Code section 2106 gave the trial court, not the jury, the authority to determine whether punitive damages were warranted.

The trial court granted the JNOV motion with respect to the malice and authorization elements of punitive damages, and the amount of the award.[3] The court ruled that there was no evidence from which the jury could have concluded by clear and convincing proof that Park Water was aware of the probable

---

[3] Park Water's motion for new trial mimicked its motion for JNOV. After granting the JNOV with respect to the punitive damages award, the trial court denied as moot the portion of the new trial motion involving the punitive damages award. The court then denied the balance of the new trial motion involving issues other than punitive damages.

9

dangerous consequences of its conduct and willfully failed to avoid them.

Plaintiffs timely appealed from the ensuing modified judgment that eliminated the punitive damages award. Park Water filed a protective appeal in the event we do not affirm the JNOV.

## DISCUSSION

I. Standard of review of a JNOV

We independently review an order granting JNOV. We determine whether substantial evidence supports the verdict, considering the evidence in the light most favorable to the party obtaining it. (*Cooper v. Takeda Pharmaceuticals America, Inc.* (2015) 239 Cal.App.4th 555, 573.) We resolve conflicts in the evidence, and we draw all reasonable inferences, against the moving defendant. (*Id.* at pp. 572–573.) If " ' " ' "there is any substantial evidence, or reasonable inferences to be drawn therefrom, in support of the verdict, the motion should be denied" ' " ' " (*Fountain Valley Chateau Blanc Homeowner's Assn. v. Department of Veterans Affairs* (1998) 67 Cal.App.4th 743, 751.)

II. Standard of proof

Section 3294, subdivision (a) requires proof by clear and convincing evidence. The clear and convincing standard "demands a degree of certainty greater than that involved with the preponderance standard, but less than what is required by the standard of proof beyond a reasonable doubt. This intermediate standard 'requires a finding of *high probability*.' " (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 998, italics added.) Clear and convincing means evidence that is " ' " ' "so clear as to

10

leave no substantial doubt" ' " ' and ' " ' "sufficiently strong to command the unhesitating assent of every reasonable mind." ' " ' " (*Butte Fire Cases* (2018) 24 Cal.App.5th 1150, 1158.)

When "reviewing a finding that a fact has been proved by clear and convincing evidence, the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true." (*Conservatorship of O.B.*, *supra*, 9 Cal.5th at pp. 995–996 & 1011.) JNOV is proper if no reasonable jury could find plaintiffs' evidence provided clear and convincing proof of malice. (See *Johnson & Johnson Talcum Powder Cases* (2019) 37 Cal.App.5th 292, 332.)

III.    Section 3294

Punitive damages serve the dual public purposes of punishment and deterrence. (*Stevens v. Owens–Corning Fiberglas Corp.* (1996) 49 Cal.App.4th 1645, 1658; see § 3294, subd. (a) [punitive damages awarded "for the sake of example and by way of punishing the defendant"].) Such damages are authorized "where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice." (§ 3294, subd. (a).) Plaintiffs proceeded under the malice prong.

Malice, as defined by the punitive damages statute, is "*despicable* conduct which is carried on by the defendant with a *willful and conscious disregard* of the rights or safety of others." (§ 3294, subd. (c)(1), italics added.) " ' "Despicable conduct" is conduct that is " 'so vile, base, contemptible, miserable, wretched or loathsome that it would be looked down upon and despised by ordinary decent people.' " [Citation.] Such conduct has been described as having the character of outrage frequently

11

associated with crime.' " (*Johnson & Johnson Talcum Powder Cases*, *supra*, 37 Cal.App.5th at pp. 332–333.) " 'Conscious disregard' means ' "that the defendant was aware of the probable dangerous consequences of his conduct, and that he willfully and deliberately failed to avoid those consequences." ' [Citation.] Put another way, the defendant must 'have actual knowledge of the risk of harm it is creating and, in the face of that knowledge, fail to take steps it knows will reduce or eliminate the risk of harm.' " (*Butte Fire Cases*, *supra*, 24 Cal.App.5th at p. 1159, italics omitted.)

Punitive damages are typically awarded for intentional torts such as assault and battery, false imprisonment, intentional infliction of emotional distress, defamation, nuisance intentionally maintained, fraud, trespass, conversion, civil rights violations, insurer's breach of covenant of good faith, wrongful termination and job discrimination, and products liability cases (*Butte Fire Cases*, *supra*, 24 Cal.App.5th at p. 1161), i.e., cases where the requisite intent to harm is present.

Nonintentional conduct can fall within the definition of malicious acts punishable by the imposition of punitive damages. (*Gawara v. United States Brass Corp.* (1998) 63 Cal.App.4th 1341, 1361.) But such conduct must be more than negligent, grossly negligent, or even reckless. (*Ibid.*) To support a punitive damage award, a nonintentional tort must involve a "conscious disregard of the rights or safety of others. [Citation.] . . . [Citation.] ' . . . There must be evidence that defendant acted with knowledge of the probable dangerous consequences to plaintiff's interests and deliberately failed to avoid these consequences.' " (*Ibid.*) Hence, when "there is no evidence the defendant intended to harm the plaintiff, there must

be evidence of conduct that is both willful *and* despicable." (*Johnson & Johnson Talcum Powder Cases*, *supra*, 37 Cal.App.5th at p. 332.)  As recently noted, " 'cases involving unintentional torts are far fewer and the courts have had to consider various factors in determining whether the defendant's conduct was despicable.  Thus, punitive damage awards have been reversed where the defendant's conduct was merely in bad faith and overzealous [citations], or the defendant took action to protect or minimize the injury to the plaintiff.' " (*Butte Fire Cases*, *supra*, 24 Cal.App.5th at p. 1161.)

To impose punitive damages on a corporation, the statute additionally requires that the requisite malice occur "among corporate leaders:  the 'officer[s], director[s], or managing agent[s].'  ( . . . § 3294, subd. (b).)  This is the group whose intentions guide corporate conduct.  By so confining liability, the statute avoids punishing the corporation for malice of low-level employees which does not reflect the corporate 'state of mind' or the intentions of corporate leaders.  This assures that punishment is imposed only if the *corporation* can . . . fairly be viewed as guilty of the evil intent sought to be punished." (*Cruz v. HomeBase* (2000) 83 Cal.App.4th 160, 167.)  Managing agents are "those corporate employees who exercise substantial independent authority and judgment in their corporate decisionmaking so that their decisions ultimately determine corporate policy." (*White v. Ultramar, Inc*. (1999) 21 Cal.4th 563, 566.)  Thus, plaintiffs seeking punitive damages "must . . . present evidence that 'permits a clear and convincing inference that within the corporate hierarchy authorized persons acted despicably in "willful and conscious disregard of the rights

13

or safety of others." ' " (*Butte Fire Cases*, *supra*, 24 Cal.App.5th at p. 1173.)

IV.    The trial court properly granted JNOV on the issue of malice.

     A. *No evidence that Park Water's management actually knew of the risk to the safety of its employees or their families*

Plaintiffs contend that the evidence is clear and convincing that Park Water's management was conscious of the danger to workers from exposure to asbestos and did nothing to test for, or to protect its employees from, that exposure. Plaintiffs reason that Sorensen admitted that Wheeler, who owned the company in the 1970's and 1980's, was "safety conscious" and *tried* to comply with safety regulations. This corporate admission combined with the existence of federal and state health and safety regulations warning of the risk of cancer from employees' exposure to asbestos, lead to the reasonable inference that Wheeler knew that his employees were being exposed to asbestos, plaintiffs argue. Thus, plaintiffs assert that Park Water's violation of OSHA's asbestos regulations—by, inter alia, failing to test and monitor the air, to warn employees, or to report asbestos use to OSHA—constituted a conscious disregard for the safety of others.[4]

---

[4] Plaintiffs' opening brief asserts that Park Water "regularly employed work practices from 1970 until approximately 1990, which generated dangerous amounts of asbestos dust from the cutting of asbestos-containing cement pipe with power saws." However, plaintiffs' record citations do not support this assertion. Plaintiffs' citations are to testimony about

14

In personal injury and product liability cases affirming punitive damages awards, the malice finding, or the punitive damages instruction, was supported by evidence that the defendant had knowledge of a danger or potential danger, *and* failed to take steps to assess and respond. Thus, the appellate court in *Pfeifer v. John Crane, Inc.* (2013) 220 Cal.App.4th 1270, 1300 to 1301, held that the defendant manufacturer of asbestos-containing products acted with malice when it failed to warn users of the dangers from handling its product. The defendant knew that asbestos dust was harmful because it took action to protect its own employees from the harm and issued a safety data sheet. The defendant was also inferentially aware that its products were likely to pose a danger to users. The defendant's retired vice president testified that the defendant's management knew that customers used methods on the defendant's products that created asbestos dust but never tested its product to ascertain whether those methods generated concentrations of fibers in excess of the regulatory limits and hence required warning its customers. (*Ibid.*)

In *Hasson v. Ford Motor Co.* (1982) 32 Cal.3d 388, 402, a former Ford engineer and manager testified that Ford knew of the problem with the brakes on its Continental models because Ford had received customer and dealer complaints. In the face of this knowledge, Ford deliberately failed to adequately test to define the nature of the problem, failed to install a fix, and failed to warn its customers of the problems with its own products. The

---

the company's failure to comply with the OSHA regulations. Such evidence does not establish the level of asbestos dust at Park Water or that such levels were dangerous.

Ford witness opined that Ford consciously disregarded safety. (*Id*. at pp. 402–403.)

In *West v. Johnson & Johnson Products, Inc*. (1985) 174 Cal.App.3d 831, 868 to 870, the evidence supported a punitive damages instruction where the testimony was that the defendant had received continuing customer complaints about vaginal infection but inadequately tested its own product. As adequate testing would have revealed an association between use of its product and vaginal infection, there was substantial evidence that the defendant had acted in conscious disregard of the safety of others. (*Id*. at p. 869.)

Here, viewing the evidence as favorably as possible to plaintiffs and indulging in every conceivable inference in plaintiffs' favor, the record contains no evidence indicating that Park Water's management knew its employees were working with asbestos such that managers trying to comply with safety regulations would have been aware of the asbestos-related laws and tested the air to establish whether their employees were in danger. The record is devoid of testimony from anyone in management in the 1970's and 1980's about what the corporation knew. Sorensen's connection with Park Water began decades later. Neither Brooks nor Francisco testified about what information decisionmakers had before 1985 or 1986, and no evidence suggests an employee made a decision that Park Water ratified. Park Water is in the business of supplying water; it neither manufactures nor supplies asbestos products, which would prompt the company to test its own equipment. Plaintiffs argue CertainTeed and Johns Manville warned Park Water about the presence of asbestos in their pipes. But there is no evidence that a manager saw CertainTeed's warnings and Brooks, who

16

worked on the pipes, did not recall seeing them. Johns Manville's technical data sheet did not warn of the risks from cutting A/C pipe. It simply referred to the AWWA standard, which document was not in the Park Water files. While at some point Park Water was a member of the AWWA, there was no indication that any decisionmaker read the AWWA standard, or was a member of AWWA any time that Francisco worked at Park Water. Finally, plaintiffs adduced no evidence of acts or conduct on the part of management, such as in *Pfeifer* where the company protected its own employees and issued a safety data sheet, that would lead to a reasonable inference that Park Water knew of the presence of asbestos before 1985 or 1986, when it banned its employees from handling A/C pipe.

Nor have plaintiffs adduced evidence that Park Water received complaints of asbestos-related harm. Unlike *Pfeifer*, *Hasson* and *West*, where the defendants did receive complaints that gave them notice of a potential risk of harm, there is no evidence that Park Water ever received a citation from California OSHA, who conducted inspections at Park Water, or that any worker's compensation or other asbestos claim was made against the company that would have indicated to management that it should test for the presence of asbestos and comply with the regulations.

The same result obtains with respect to the danger posed by take-home asbestos exposure. Plaintiffs insist that Park Water should have known in the 1970's that take-home asbestos exposure posed a risk to its employees' families. Plaintiffs quote from *Kesner v. Superior Court* (2016) 1 Cal.5th 1132, 1145 to 1146, that reasonably thoughtful employers making industrial use of asbestos in the mid-1970's would consider the possibility of

17

secondary asbestos exposure.  The Supreme Court explained that the OSHA standards requiring precautions against take-home exposure put employers on notice of the reasonable foreseeability of such harm.  (*Id*. at p. 1148.)  Based on *Kesner*, plaintiffs argue that Park Water was on notice in the 1970's of the harm caused by take-home exposure.  We accept that by 1976 it was foreseeable that workers who were exposed to asbestos could be bringing its fibers home on their uniforms.  However, the foreseeability of take-home exposure in a vacuum does not constitute clear and convincing evidence that Park Water's management was aware that it was "making industrial use" (*id*. at p. 1145) of asbestos triggering the obligation to assess whether its employees were exposed to illegal levels of airborne fibers, and to consider the subsequent possibility that its employees might risk taking that asbestos home.

We assume for purposes of this opinion that in the 1970's and 1980's it was a given that asbestos could cause cancer.  Certainly, it would be reasonable to infer that *if* Park Water knew its employees worked with asbestos products and tried to stay current with safety requirements applicable to its employees, that decisionmakers would have known of the asbestos-related regulations and the need to analyze the air and protect employees.  But, the record contains an evidentiary gap: absent evidence from which an inference may be drawn that Park Water management knew of the risk posed to its employees in the construction and service departments working with asbestos, it is not reasonable to infer from the company's general safety consciousness alone, that it is highly probable that the company was aware of the specific risk to its own employees and their

18

families of asbestos, or that it should conduct testing to ascertain the risk.

B. *No evidence that Park Water willfully and deliberately disregarded the risk of asbestos exposure.*

Plaintiffs address each OSHA safety requirement to argue that Park Water's failure to comply with many of them constituted clear and convincing evidence of a conscious disregard of the danger of exposure to asbestos fibers. Plaintiffs add that even if the decision not to comply with the state and federal regulations was made by a low level employee, it was ratified or authorized by a corporate officer, director, or managing agent.

The record here is devoid of evidence leading to an inference about Park Water's state of mind, i.e., why company decisionmakers failed to abide by the regulations. First, there is no indication about corporate motive. For example, in *Hasson*, *supra*, 32 Cal.3d at page 403, Ford concealed the danger to protect its reputation among its consumers. In *Romo v. Ford Motor Co.* (2002) 99 Cal.App.4th 1115, 1144 (cert. granted and opinion vacated by *Ford Motor Co. v. Romo* (2003) 538 U.S. 1028), policymakers were strongly motivated to bring the Bronco to market in 1978 and knew they could not do so if they tested it. In contrast, Park Water had no incentive to ignore the safety violations where the PUC would allow it to recover the costs of implementing safety measures from ratepayers.

Second, the record is devoid of evidence supporting an inference about corporate leaders' objectives. Punitive damages jurisprudence requires evidence both that the defendant had actual knowledge of the risk of harm it was creating and that " 'in the face of that knowledge,' " the defendant failed to take steps it knows will reduce or eliminate that risk. (*Butte Fire Cases*,

19

*supra*, 24 Cal.App.5th at p. 1159.) But the record here contains no evidence the company knew that asbestos was present in the pipes and so Park Water's mere failure to comply with asbestos regulations does not mean ipso facto that management consciously and intentionally decided to ignore them. It is not reasonable to infer from Wheeler's safety consciousness and attempts to remain current with safety regulations, that the company decided to knowingly disregard the asbestos regulations. Stated otherwise, the abstract awareness that asbestos causes cancer combined with the failure to observe asbestos safety regulations, without knowledge that asbestos was present at work, do not reasonably support an inference that it was highly probable the failure to apply the regulations was the result of a willful, deliberate decision to ignore the risk of harm. " ' "[P]unitive damages should not be allowable upon evidence that is merely consistent with the hypothesis of malice, fraud, . . . or oppressiveness. Rather some evidence should be required that is inconsistent with the hypothesis that the tortious conduct was the result of a mistake of law or fact, honest error of judgment, over-zealousness, mere negligence or other such noniniquitous human failing." ' " (*Food Pro Internat., Inc. v. Farmers Ins. Exchange* (2008) 169 Cal.App.4th 976, 994.)

In *Butte Fire Cases*, *supra*, 24 Cal.App.5th 1150, one of the plaintiffs' contentions was that the defendant knew of the risk of wildfire from the contact between trees and the defendant's power lines but demonstrated conscious disregard for the rights and safety of others by failing to directly verify the proper functioning of risk management controls and fire mitigation measures (*id*. at p. 1166), and by policies that delegated responsibility for managing wildfire risk to individual

departments (*id.* at p. 1166).  In holding there were no triable issues precluding defendant's summary adjudication motion on the question of punitive damages, the appellate court explained it had "no quarrel with the notion that an inference of corporate malice can be based on the existence of a company policy that willfully, consciously, and despicably disregards the rights and safety of others" (*id.* at p.1173), or that "corporate malice can be shown, in the case of a large corporation, 'by piecing together knowledge and acts of the corporation's multitude of managing agents' " (*ibid.*).  However, the court in *Butte Fire Cases* explained that the plaintiffs "would have us go one step further and hold that a company policy that fails to protect against a known risk of harm necessarily raises an inference of corporate malice, since the existence of the policy establishes the company's state of mind with respect to the risk.  Put another way, plaintiffs would have us conclude that an unsuccessful risk management policy necessarily reflects a conscious and willful company decision to ignore or disregard the risk.  This we decline to do." (*Ibid.*)

Here, plaintiffs' argument is even more tenuous because they adduced nothing to show that Park Water managers knew that its employees were handling asbestos or had a policy for mitigating the risk of that contact.  Plaintiffs' position then is that management's safety consciousness, in the context of intellectual awareness that asbestos is toxic, coupled with corporate inaction, necessarily reflects management's knowing, willful, deliberate, and despicable decision to ignore the danger to employees and their families.  To state the argument is to demonstrate its weakness.  If an unsuccessful policy does not establish corporate state of mind, then a complete absence of

21

knowledge and lack of a policy cannot demonstrate clear and convincing evidence of corporate intention.

At best, plaintiffs have demonstrated that Park Water violated federal and state regulations by failing to test for the presence of asbestos and then by failing to abide by the safety requirements had those tests revealed excessive asbestos levels. But the violation of a statute is negligence per se, which is a negligence doctrine (see *Spates v. Dameron Hospital Assn.* (2003) 114 Cal.App.4th 208, 218), not willful conduct on which to base a finding of malice. The lack of safety measures, absent evidence that the company also knew it was putting others at risk of harm by its inaction, does not constitute blatant disregard of the statutes, plaintiffs' assertion to the contrary notwithstanding.

In sum, the record contains no evidence, let alone clear and convincing evidence, that any officer, director, managing agent, decisionmaker or responsible executive at Park Water knew its employees were handling asbestos and hence that asbestos-related regulations needed to be implemented to prevent harm to its employees and their family members, but instead willfully and deliberately spurned those measures. Park Water's management may have been negligent, even grossly negligent, in failing to learn it was violating OSHA. Yet, without actual knowledge by a decisionmaker of the presence of asbestos at work and the consequential danger from failing to protect others from the risk of harm caused by fibers, the mere failure to implement safety measures does not equate with malice. As plaintiffs failed to adduce clear and convincing evidence that the company acted with malice, JNOV was properly entered. Given our conclusion, we need not address plaintiffs' remaining appellate contentions or Park Water's contentions in its appeal.

## DISPOSITION

The judgment is affirmed.  Each party to bear its own costs on appeal.

NOT TO BE PUBLISHED.


DHANIDINA, J.


We concur:



EDMON, P. J.



LAVIN, J.