Filed 4/29/22  P. v. Swig CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>          Plaintiff and Respondent,<br><br>v.<br><br>JULIAN SWIG,<br><br>          Defendant and Appellant. | A163508<br><br>(Alameda County<br>Super. Ct. No. 98046502) |

Following a bench trial, the court found defendant Julian Swig met the criteria for a mentally disordered offender (MDO) and entered an order on August 18, 2021, extending his commitment to September 12, 2022.  (Pen. Code, § 2970[1]).  Swig seeks reversal on the sole basis that the evidence was insufficient to support a finding, beyond a reasonable doubt, that at the time of trial he represented a substantial danger of physical harm to others.  We affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

#### A.     Background

Swig was first diagnosed with schizophrenia in the 1970s.  At the time of the 2021 trial, Swig was 78 years old and suffering from "schizophrenia continuous," a major mental disorder that substantially impaired his

---

[1]     All undesignated statutory references are to the Penal Code.

cognitive and emotional processes and judgment, and his perception of reality. Swig's primary symptom was delusions, i.e., "non-reality" or "fixed false" beliefs, which did not change in light of contrary information provided to him. "Continuous" meant the schizophrenia symptoms were present for greater than six months without a period of remission.

Swig's commitment offense occurred in 1997, when he wrote a letter to a now retired superior court judge threatening to kill her if she did not immediately dismiss a conviction for which he had been placed on probation. In 1998, Swig pleaded no contest to the felony offense of threatening a public official (§ 76).

On July 19, 2003, Swig was civilly committed after being found to be an MDO. He was twice released for community outpatient treatment pursuant to the Conditional Release Program (CONREP) for significant periods of time – August 8, 2005 to February 8, 2012, and October 1, 2012 to September 15, 2016. In 2012, he was returned due to "an increase in psychiatric symptoms." In 2016, he was returned due to "a worsening of symptoms, he was being hostile, agitated, threatened CONREP staff, and was not compliant with his recommended treatment." Although Swig had not committed actual physical violence, one incident leading to the second return was Swig's threat to use a box cutter to cut the throat of a CONREP supervisor. Swig's status as an outpatient was formally revoked on November 1, 2017 and he has thereafter been recommitted as an MDO.

In late November 2018, Swig began refusing psychotropic medications, with the exception of Diphenhydramine HCL (Benadryl). His treating psychiatrist petitioned for an involuntary medication order (IMO), which was granted by the court on January 22, 2019, and thereafter continued by court order.

## B. Trial Court Proceeding

On March 25, 2021, the prosecution filed a petition seeking a one-year commitment extension until September 2022. Swig waived his right to a jury. A bench trial was held on August 17 and 18, 2021 before the same judge that had adjudicated the immediately preceding petition. The court granted the prosecution's request to admit into evidence Swig's hospital records, and the parties stipulated under *People v. Sanchez* (2016) 63 Cal.4th 665, and *People v. Burroughs* (2016) 6 Cal.App.5th 378, to waive any objections to expert witness testimony based on "case specific hearsay" in the hospital records.

### *Prosecution's Case*

### *Dr. Ashley Wanner*

Dr. Ashley Wanner was qualified as an expert in psychology to testify regarding the diagnosis, evaluation and treatment of major mental illness, violence risk and risk of future dangerousness, and whether Swig met the criteria for continued commitment as an MDO.

Wanner testified that for the two previous commitment extension periods (September 2018 to September 2019 and September 2019 to September 2020) she had evaluated and determined that Swig met the criteria for commitment as an MDO. The trial court took judicial notice of its decision, made after the hearing in late February or early March 2021, that Swig met the criteria for commitment as an MDO and that his commitment had been extended to September 2021.

Since her prior testimony given in March 2021, Wanner had not observed anything that changed her opinion that Swig met the criteria for an MDO. Swig continued to demonstrate "fixed false" beliefs that were

3

consistent with the delusional beliefs he held since 1997.[2] Wanner conceded people could have odd or extreme beliefs, but Swig's beliefs met the criteria of a mental disorder because of the severity of their impact – he was not able to maintain a job or long-term relationships, he was not able to successfully live independently, and he had repeated contact and involvement with law enforcement and the criminal justice system.

Wanner had been Swig's treating psychologist for "nearly three years"; she was available to see Swig four days a week but did not interact with him every day. Swig resided in a unit for "elderly males" where he was placed due to his age. "[A] great majority of the year" Swig was ambulatory, moving around without the use of a walker or wheelchair. In the previous six months Swig had not engaged in any treatment offered by Wanner, had not worked on a required relapse prevention plan, and had refused to discuss his diagnosis, medications, or plans for transitioning to the community with his treatment team. Wanner opined that, without treatment, it was very unlikely Swig's schizophrenia would go into remission because schizophrenia required psychotropic treatment in the long term, particularly for an individual who had demonstrated continuous symptoms for nearly 50 years. During the past year, Swig's symptoms had responded at least in part to

---

[2]     Wanner explained some of Swig's fixed false beliefs. For example, Swig had an issue with capital letters and how his name was documented in court orders and hospital documents – if his name was capitalized or written last name, first name, Swig did not believe the document referred to him and would refuse to comply with the court orders or hospital documents. Swig also believed there were two United States constitutions and that our current government was not operating in a legal way under the legitimate constitution. Swig also believed our current monetary currency was not legitimate because it differed from the federal reserve note; he consequently believed it would be illegal for him to use dollars to pay bills, debts, and bus and train fares.

4

medications and he had benefited from the structure and supervision inherent in the in-patient hospital setting, but not to the extent that he had demonstrated a remission of his symptoms or that he could be safely transitioned to the community.

Wanner further testified that Swig had not accepted that he suffered from schizophrenia and required medication and psychological services. Swig denied he had any "triggers," i.e., "stressor[s]," which brought on unwanted or unpleasant emotions or thoughts that could result in unhealthy behaviors. In a relapse plan that Swig provided to Wanner over a year before the trial, Swig indicated he did not have any triggers because he did not have a mental illness, but if he did have triggers "they might be homicidal ideation or thoughts about killing people." Wanner opined that Swig knew why he was committed and understood what he had to do in order to be discharged as he had been successfully discharged in the past. Wanner further opined, however, it was very important that Swig understand he had schizophrenia and needed treatment, i.e., that he have "insight," because as it "states in the DSM V . . . individuals who lack insight have the greatest risk for involuntary treatments, for incidents of aggression or violence, and for worsening of symptoms."

Since the last trial Swig had sustained two major rules violations. One was a recent refusal "to return his state issued U.S.B. drive . . . in protest of the patient printer not working." Swig returned it some days later, after being placed on a 30-day restriction. A second major rule violation was an "assault" on another patient in June 2021. The patient reported Swig "had pushed him on their way back from lunch." The patient pushed Swig back, and "Swig reportedly swung at [the patient] in an attempt to punch" him but Swig "made no contact" and the patient was "able to avoid contact." As a

5

consequence, Swig was placed on a 30-day restriction barring him from attending off-unit activities, and the incident "set his progress back at least six months to meet the criteria" toward discharge.

Wanner also testified that Swig used his "physical stature in an intimidating fashion" in the course of two incidents in 2020 and two incidents in 2021. In February 2020, Swig came to Wanner's office door, insisted she help him serve a subpoena on the executive director of the hospital, and offered money for her help. Wanner explained she could not accept money and would not assist him. When she tried to close her office door, Swig used his body to stop her. In June 2020, Swig followed her around the unit and came into one of her group sessions. While she was facilitating the group and seated, Swig stood next to her and tried to ask her questions unrelated to the group topic. She asked him several times to stop and even moved to a different area of the room, but Swig continued to stand over her while speaking loudly and "in an angry fashion," and prevented her from moving further away. Other staff observed what was going on and had Swig removed from the room.

In February 2021, Wanner and Swig, together with another staff member, met at Swig's request in the patient computer room. Swig used "his physical stature and body in an intimidating fashion" when he did not receive the responses he wanted. Three months later, in May 2021, Wanner met with Swig to give him paperwork to encourage him to submit to an EKG. When Wanner gave Swig a copy of the IMO to show he had to agree to the EKG, Swig asked if the court order referred to him as a man or a person (consistent with some of his delusional beliefs regarding men versus persons and the rights of individuals). When Wanner explained the court order simply named him, Swig ripped it up. "He raised his voice, he was very loud,

6

he demonstrated tense and angry affect, meaning facial expressions." When ripping up the court order, he extended his fist and "inadvertently" made contact with Wanner's stomach. Wanner was not injured and she believed the contact was unintentional but demonstrated Swig's "poor control" over his behavior when he was "emotionally dysregulated and upset." Despite these incidents, Swig remained on the same unit as it already had "the most restrictions."

When questioned as to how Swig's delusions related to his being dangerous "to the point he [would] attack a random person in the community," Wanner explained that her opinion was based on "writings [Swig] authored where he said that certain people of the Government, judges and treatment team members, deserve to die, deserve a bullet, assassination, hanging, because he disagreed with their position in the Government and didn't think it was a legitimate authority to rule over him." Based on her knowledge of Swig's history, her direct observations, and "the use of evidence base tools that identify risk factors that suggest risk for violence," she opined that without a high level of structured supervision Swig was at risk of committing substantial harm "including threats of killing people, and physical contact and physical assault." When asked what evidence she had Swig would physically assault someone, she referred to the May 2021 and June 2021 incidents describe above, along with "an actual assault" on another hospital patient reported in 2018. When asked as to the "substantial basis" for her opinion that Swig "is substantially dangerous if he is released into the community," Wanner gave some weight to Swig's writings, but she gave the "most weight" to his "lack of insight, lack of acceptance of his diagnosis, lack of willingness to work with his treatment team, to manage his illness and create plans for safe integration into the community."

7

### Dr. Lindsey Alvis

Dr. Lindsey Alvis was qualified as an expert forensic psychologist to opine as to whether Swig met the criteria for an MDO.  In preparing her March 2021 evaluation, Alvis relied on the documents in Swig's hospital records and previous court reports and also interviewed his psychologist. Alvis made one attempt to speak with Swig at the hospital; on that occasion she personally asked, three times, if Swig would consent to an interview for a court report and he declined each time.  Since her March 2021 evaluation, Alvis reviewed and was "current" on all of the treatment progress and notes in Swig's hospital records.

Alvis opined Swig suffered from the severe mental disorder of "schizophrenia, continuous," exhibiting symptoms of "delusions, which are quite long standing and fixed" that revolved around "a few different specific legal issues;" in the past he suffered from auditory hallucinations, which he denied; a "disorganized thought process," particularly when confronted on his delusional beliefs; and "negative symptoms of psychosis" including "adulation in personality and lack of attention to personal hygiene."  Swig's schizophrenia affected his ability to think rationally, to consider information contrary to his beliefs, to comply with both psychological and medication treatment, and to use good judgment "so he continue[d] to do things that are against the law or against hospital rules, even within a highly structured and supportive setting."

When asked to give examples of Swig's behavior showing his schizophrenia "grossly" impaired his behavior, Alvis stated: "He has these fixed delusions that . . . lead him to recurrently engage in the same criminal behavior that led him to be arrested and charged initially with these same types of crimes of threatening people. [¶] And he has repeatedly engaged in

8

that same behavior over . . . at least 20 years. [¶] He has also done so while on probation and while on parole. [¶] He has done so while on CONREP supervision and while in the hospital setting." In addition to his "unusual beliefs," Swig met the diagnostic criteria for schizophrenia based on his "disorganized thought process and negative symptoms," and his delusions significantly impaired his ability to lead a productive life. Alvis also opined that Swig's schizophrenia was not in remission; during the last year Swig continued to exhibit "[d]elusions, irritability, anxiety, disorganized thought process, and negative symptoms of psychosis."

Alvis explained it was important for Swig to understand he suffered from schizophrenia and required treatment because "absent the recognition of his illness, he is very unlikely to engage in any type of treatment that might help mitigate his symptoms, and therefore mitigate his reckless, dangerous behavior. [¶] He is unable to understand how his symptoms put him at risk in engaging in illegal or dangerous behavior, and taking the necessary steps to control those symptoms. [¶] So, essentially, without recognition of this illness he is not going to be in compliance with treatment, and he is not going to recognize that his behaviors are problematic."

Alvis opined that Swig represented a substantial danger of physical harm to others based on the following: Swig had "a history of engaging in aggressive behavior dating back to the 1980s or 1990s at least. He has a prior conviction for assault. [¶] He engaged in some violent behavior . . . toward a social worker. [¶] He was also charged with a battery . . . . [¶] He [also has] a history of making explicit threats [of] harm, specifically murder, toward other people. [¶] And within [his current unit] he has engaged in some physical aggression, as well [as] physical intimidation of others. [¶] Just in June he had an altercation with a peer that was reportedly physical in nature. And in

9

2020 he had a couple of intimidating incidents toward . . . Wanner, one of which occurred when he tried to prevent her from getting through a doorway or closing her office door. [¶] And on another occasion he followed her around the unit and then stood over her while she was seated, and had to be removed from the room by staff. [¶] So, in short he has a history of aggressive behavior even while in a highly structured and supportive setting, and even while on antipsychotic medication. [¶] So, my opinion is that if he were to be released, given that he is unlikely to continue treatment that would help curve aggressive impulses out in the community, he would be a much higher risk of engaging in violent behavior." The substantial danger of physical harm that Swig posed to others was connected to his mental disorder as his "delusions lead him to have very fixed ideas about things, including currency, bus fares, how his name is written, certain terminology," and he "becomes very irritable and hostile when people [do not] comply or [do not] fall in line with the way he believes."

When again asked to point to facts that supported her opinion that Swig posed a substantial danger of physical harm, as opposed to other types of harm, Alvis stated: "[H]e has had several incidences of physical harm in the past, some have been alleged in prison, some have been documented in the hospital setting. He had this conviction for assault that I found in his record. [¶] And, he has routinely threatened to harm people in a serious way on many, many occasions, including while in the hospital, in 2018. [¶] So, given that he has made at least some of those threats while on medication, while in a structured and supportive setting where his behaviors are being monitored, and interventions are being applied, and staff are trained to de-escalate situations, if he were to be in a less structured setting, it is hard to

10

imagine that his behaviors would not become more severe, and physically aggressive."

Swig's lack of insight into his illness and need for treatment also factored into Alvis's opinion that Swig posed a substantial danger to others: "[G]iven that he lacks that insight, he has been unable to modif[y] his behavior in a way that he would be able to comply with the law, and [refrain] from violating the rights of others. [¶] He has been unable to come up with other avenues for achieving these goals . . . to meet certain ends. [¶] So, he continues to engage in the same behavior that [has] continually gotten him into trouble. [¶] If he had insight into his illness I think he would have the capacity to consider alternate routes of meeting goals, or perhaps even alternate goals, but he is so lacking in insight that he can't even have a conversation with the treatment provider about his symptoms, without becoming emotionally dysregulated and angry."

### Defense Case

Swig testified on his own behalf. He understood the court proceeding was to determine whether he should be released into the community. He did not agree that he posed a danger to the community. He did not hear voices that told him that he needed to hurt people and he knew how to behave in the community and not attack anyone. When asked if he knew how to follow social rules that "you don't punch people or get in fights for no reason?," he replied "No."

Swig was asked if he recalled the altercation with a fellow patient at the hospital. He explained the circumstances as follows: "We were in the bathroom and he gave me orders to flush the toilet, and I just walked out, watching T.V., he came out, very aggressive, swung at me, spit popcorn at me, . . . [a]nd, . . . my arm was bruised, my chin was bruised, he was hitting

11

me. I did not slug him." He did not remember if the staff had given him the opportunity to explain what had happened and he never saw the other patient again, "[a]pparently he . . . misrepresented what happened."

Swig was questioned about the experts' testimony that he had written something about "homicidal ideation." He denied he had ideas or ideation of killing or hurting anyone, and explained he wrote to "get [his] ideas out," and when he described a threat it was not his intent to carry out that threat at some future time. In explaining what he had written concerning the judge that was the victim of his commitment offense, Swig stated: "So, I said the hypothetical, if I was to kill you and if the District Attorney follows the rules in the Penal Code, you could agree that I couldn't be prosecuted." He understood he was recommitted to the hospital in 2016 "to get help with regard to [his] delusional ideas about the legal system," and the recommitment had nothing to do with "violence or physical harm to anyone in the community." When asked his plans if released into the community, Swig explained he was a good candidate to receive the assistance of a social worker to find him a safe place to live where he could use his computer and a printer.

Swig was questioned concerning the testimony regarding his intimidating and aggressive behavior. When asked if he had used his body and size (5' 10") to intimidate, Swig replied, "No, Dr. Wanner is about my size, if not a little bit bigger."[3] He also denied approaching people with the intent to intimidate and stated he had no desire or intent to get into a physical confrontation with anyone.

---

[3] During closing arguments, the prosecution asked the court to take judicial notice of the fact that Wanner was not as big or bigger than Swig; "that is simply not true, she is not nearly as large as he is." The court did not specifically rule on the request.

12

Swig further testified that if released he would not pose a risk of substantially causing physical harm to others because he had not done so in the past, he had no incidences of dangerous behavior during the eight years at CONREP, and he was recommitted based on his alleged delusions regarding legal matters and he had walked out on a group at CONREP.

On cross-examination, Swig stated he was hospitalized "[b]ecause I'm confused for a statutory person," which is defined in the Penal Code as including "a corporation, as well as a natural person." Swig went on to say that he was not a natural person, he was a man, and that under the law a man was not a person, and therefore because he was a man he should not be at the hospital. Similarly, when questioned about the court order mandating that he take medication, Swig did not think the order applied to him because the court had no standing to make the order.

Swig admitted that in 1997 he mailed a letter to a judge that was the basis for his commitment offense, but asserted he would never write such a letter now. When shown another letter written in 1997 to the same judge, again threatening to kill the judge, Swig identified his handwriting but he did not recall mailing that second letter, he was "shocked" and did not remember writing the letter, and he would never do it again. On redirect, when asked if he would write anything similar if released, Swig said, "No, I'm kind of horrified by it." He admitted that in 2018 he wrote another letter to the same judge, in which he said, " 'If I were to murder you,' " but stated he had shown the letter to his treatment team for their advice, they were not receptive to it, and when he reviewed the letter he knew it was based on an unsound assumption and so he did not mail it. While Swig did not intend to murder the judge, he confirmed that if he did the law that made murder illegal would not apply to him because he was "a man" and not "a person."

13

Swig confirmed he did not believe he suffered from schizophrenia and had refused to attend meetings with his treatment team. While he worked on a release plan by himself he did not know if his treatment team was aware of that plan. Also, Swig did not believe the prescribed medication he was forced to take made any difference. During the eight years when he was an outpatient he took medications and did not notice any effect. When asked if in 2016 he had stopped taking his prescribed medications, which was one reason for his recommitment, he denied stopping the medication and stated he was taking "one dose only." He denied he threatened to slit the throat of a CONREP staff member when the staff member told him he had to pay a fare on public transportation. However, he admitted he would not pay a fare on public transportation because he did not believe there was a law that required the payment of the fare.

### *Trial Court's Ruling*

The trial court heard from counsel, found beyond a reasonable doubt that Swig met the criteria for an MDO, and ordered Swig's commitment be extended for one year. In so ruling, the court relied on the testimony of the expert witnesses and the facts within the medical records admitted into evidence.

## DISCUSSION

"Section 2970 permits a district attorney, on the recommendation of medical professionals, to petition to recommit an offender as an MDO for an additional one-year term. An offender will be recommitted if 'the court or jury finds [1] that the patient has a severe mental disorder, [2] that the patient's severe mental disorder is not in remission or cannot be kept in remission without treatment, and [3] that by reason of his or her severe mental disorder, the patient represents a substantial danger of physical

14

harm to others.' (§ 2972, subd. (c).)" (*People v Foster* (2019) 7 Cal.5th 1202, 1208.)

Swig does not challenge the sufficiency of the evidence to support the court's findings that he suffers from the severe mental disorder of schizophrenia that is not or cannot be kept in remission without treatment. He limits his argument on appeal to a challenge to the sufficiency of evidence to support the court's finding, beyond a reasonable doubt, that at the time of trial he represented a substantial danger of physical harm to others. Relying on isolated portions of the record, he asks us to consider the following: his age (78); that his commitment offense occurred a quarter century ago and consisted of a written threat against a judicial officer that, although undeniably serious, were merely part of an ongoing series of harmless verbal rants unaccompanied by any intent or apparent ability to act on them; since that time his conduct has been either clearly nonviolent and did not involve actual physical harm, or at best was ambiguous; and the remaining justifications, such as his alleged lack of insight or failure to comply with treatment, consisted of "pure makeshift" arguments that are not sufficient to justify his continued commitment as an MDO. We conclude Swig's assertions are unavailing.

Our standard of review is well settled. "In considering the sufficiency of the evidence to support MDO findings, [we] . . . must determine whether, on the whole record, a rational trier of fact could have found that defendant is an MDO beyond a reasonable doubt, considering all the evidence in the light which is most favorable to the People, and drawing all inferences the trier could reasonably have made to support the finding." (*People v. Clark* (2000) 82 Cal.App.4th 1072, 1082.) " ' " 'Although we must ensure the evidence is reasonable, credible, and of solid value, nonetheless it is the exclusive

15

province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts on which that determination depends. [Citation.] Thus, if the [finding] is supported by substantial evidence, we must accord due deference to the trier of fact and not substitute our evaluation of the witness's credibility for that of the fact finder.' " ' " (*Id*. at pp. 1082–1083.)

Here, the trial court was presented with evidence from two experts qualified to opine as to whether Swig represented a substantial danger of physical harm to others, which evidence was more than sufficient to support the court's finding on that criteria element. (See *People v. Williams* (2015) 242 Cal.App.4th 861, 875, fn. 6 ["a single expert opinion as to a person's dangerousness is substantial evidence to justify the extension of his commitment" under section 1026.5 [insanity]]; *People v. Bowers* (2006) 145 Cal.App.4th 870, 879 [accord].)

Both Wanner and Alviso provided detailed explanations of the evidentiary bases for their opinions that if released Swig would represent a substantial danger of physical harm to others. Wanner specifically testified to incidents (within the last two years of hospitalization) in which Swig, despite his age and health conditions, acted in an inappropriate manner, including intimidating conduct toward hospital staff and assaultive conduct toward another patient. Swig's challenges to the evidentiary bases and opinions of the experts are not persuasive. While the statute does not define " 'substantial danger of physical harm to others,' " in context, "it appears to mean a prediction of future dangerousness by mental health professionals." (*In re Qawi* (2004) 32 Cal.4th 1, 23–24 (*Qawi*); see *In re Calhoun* (2004) 121 Cal.App.4th 1315, 1351 ["[t]he dangerous finding requires only an assessment of future dangerousness"].) " ' "[S]ubstantial danger of physical

16

harm" does not require proof of a recent overt act' " for purposes of commitment as an MDO. (*Qawi*, *supra*, at p. 24, quoting § 2962, subd. (g).) As explained by our high court, "in cases where lack of control is an issue, 'inability to control behavior' will not be demonstrable with mathematical precision." (*Kansas v. Crane* (2002) 534 U.S. 407, 413.) "[T]here may be 'considerable overlap between a . . . defective understanding or appreciation [i.e. lack of insight] and . . . [an] ability to control . . . behavior.' " (*Id.* at p. 415.)

Swig asks us to consider that the evidence of his dangerousness is similar to that of the defendant in *People v. Johnson* (2020) 55 Cal.App.5th 96, decided by our colleagues in Division Two. The *Johnson* court reversed an order of recommitment after concluding there was insufficient evidence to support a finding, beyond a reasonable doubt, that the 69-year-old Johnson, whose schizophrenia was in partial remission, posed a substantial danger to the physical harm of others. (*Id.* at pp. 99, 105, 107.) The *Johnson* court found significant that "the *sole* evidence the [trial] court relied on to support the dangerousness finding was appellant's violence from decades earlier, with only friendly and nonconfrontational behavior ever since, even while he was AWOL from CONREP, off of his medications for a significant period of time, and decompensating. [¶] Such a complete absence of violent or aggressive behavior of any kind over a long period of time is necessarily an important, objective factor that must not be ignored when determining an MDO defendant's dangerousness." (*Id.* at p. 110, fn. omitted; italics in original.) Unlike in *Johnson*, the record in this case does not show that Swig acted in only a "friendly and nonconfrontational" manner, whether in an unsupervised outpatient setting under CONREP supervision or in a supervised hospital setting under an involuntary medication order. Rather, the record includes

17

evidence of Swig's angry and intimidating behavior when he did not get what he wanted or his delusional beliefs were challenged by CONREP staff or hospital staff.

In sum, we conclude the evidence was sufficient to support the trial court's finding, beyond a reasonable doubt, that Swig represented a substantial danger of physical harm to others if released. When specifically addressing dangerousness, the court explained that the expert witnesses had credibly testified concerning Swig's "aggressive behavior," even when in the highly structured setting in which he was currently residing, and even while under an involuntary medication order, and "the testimony is that he would present a much higher risk if those conditions were removed." By his arguments, Swig is attempting to "reargue on appeal those factual issues decided adversely to him at the trial level, contrary to established precepts of appellate review. As such, it is doomed to fail." (*Hasson v. Ford Motor Co.* (1982) 32 Cal.3d 388, 398.) Accordingly, we affirm the order extending Swig's commitment because it is supported by substantial evidence.

## DISPOSITION

The August 18, 2021, order is affirmed.

_____
Petrou, J.

WE CONCUR:


_____
Tucher, P.J.


_____
Fujisaki, J.


_A163508/People v. Swig_

19